IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **DANIEL LONERGAN,** | Case No. 1:24-cv-02067-PAB |
| **Plaintiff,** | |
| -vs- | **JUDGE PAMELA A. BARKER** |
| **GALLAGHER SHARP, LLP,** | |
| | **MEMORANDUM OPINION & ORDER** |
| **Defendant.** | |

Pending before the Court is Defendant Gallagher Sharp, LLP's ("Defendant" or "Gallagher Sharp") Motion for Judgment on the Pleadings ("Motion"). (Doc. No. 7.) For the following reasons, Defendant's Motion is GRANTED.

**I.  Factual Allegations**

Plaintiff Daniel Lonergan ("Plaintiff" or "Lonergan") sets forth the following factual allegations in his Complaint. (Doc. No. 1.)

Defendant is an interstate law firm with its principal place of business in Cleveland, Ohio. (*Id.* at PageID #2.) Lonergan is a practicing attorney who resides in Cuyahoga County, Ohio. (*Id.*) Lonergan is a "36 year old man who struggles with severe Attention Deficit Hyperactivity Disorder." (*Id.*) Lonergan graduated from law school in May of 2020, "right as much of America shut down due to the COVID-19 pandemic … [and] began [his] legal career at a prestigious downtown Cleveland law firm, but was forced to step away to address mental health concerns." (*Id.*)

On July 24, 2023, "[a]fter taking a year to recover and heal, … [Lonergan] started with Gallagher Sharp as a general litigation associate." (*Id.*) "Despite initial optimism, [Lonergan] quickly

found that [his] disability created a barrier for [him]." (*Id.* at PageID #3.) Specifically, Lonergan "struggled to bill hours in the manner the firm desired." (*Id.*)

Lonergan alleges that "[s]eeking a workable solution, [he] informed upper management of [his] disability and that it was interfering with [his] performance," but "was told that this was not their problem, and that [he] should have figured out how to deal with [his] own disability by this point in [his] life." (*Id.*) Lonergan also alleges that he "repeatedly approached partners at the firm and suggested accommodations that [he] believed would allow [him] to accomplish [his] position's necessary tasks," but that "[i]n each instance, [he] was told that [his] suggestions simply would not work, and that [he] needed to figure it out on [his] own." (*Id.*)

In its Answer, Defendant attaches numerous email examples of Lonergan's communications with upper management.[1] For example, on September 6, 2023, Lonergan sent an email to his "assigned internal mentor"[2] Maia Jerin ("Jerin") titled "August Time (I'm a disaster)" that indicated the following:

---

[1] The Court finds that it may rely upon the emails attached to Defendant's Answer. Under Sixth Circuit case law, a court may consider documents that "[are] referred to in the [plaintiff's] complaint and [are] central to the plaintiff's claim" without converting the Rule 12(c) motion to one for summary judgment. *Greenberg v. Life Ins. Co.*, 177 F.3d 507, 514 (6th Cir. 1999); *see also Showman v. Q Corporate Holdings, LLC*, 2024 WL 2083518, at *3 (N.D. Ohio May 9, 2024) (Barker, J.). The Court agrees with Defendant that each of these emails is referred to in the Complaint, either explicitly or implicitly, in relation to Lonergan's allegations of: (i) informing Defendant of his disability's "interfer[ence] with [his] performance"; (ii) "being placed on probation" on December 6, 2023 and the relevant emails associated therewith; (iii) emailing with Monica Sansalone on February 7, 2024; and (iv) correspondence and subsequent termination on April 9, 2024. (*See* Doc. No. 1 at PageID #3–4.) Moreover, Lonergan does not contest the authenticity of these emails or meaningfully challenge their inclusion—rather, he too relies upon them in his Opposition. (*See, e.g.*, Doc. No. 8 at PageID #64 ("In this instance, Defendant's own exhibits document my continued communication with management, desperately searching for an accommodation that would suit both parties.").) Finally, with respect to Lonergan's Complaint describing the content of certain emails that were later attached to Defendant's Answer, the Court finds it appropriate to rely on the exact language of the emails rather than Lonergan's characterization of them. *See Brown v. Louisville-Jefferson County Metro Government*, 135 F.4th 1022, 1030 (6th Cir. 2025) ("[W]hen an exhibit contradicts the complaint, the exhibit trumps the allegations.").

[2] Defendant indicates in its Answer that Maia Jerin was Lonergan's "assigned internal mentor." (Doc. No. 6 at PageID #21.) Lonergan does not appear to dispute this in his Opposition. (Doc. No. 8 at PageID #62.)

> "Hi Maia,
>
> I am working to get my time entered this morning, but realize I've not left myself in a great spot. I wanted to give you a heads up that my time this month is a little bit of a mess, but that I'm working to make sure that does not happen again. Happy to discuss later, after I get through this slog.
>
> Nothing to be super worried about, just wanted to make sure you had a heads up.
>
> Best,
> Dan."

(Doc. No. 6-1 at PageID #33.) Similarly, on October 4, 2023, Lonergan emailed various individuals the following:

> "Good afternoon,
>
> My September time has not been properly entered. I am working to release it all right now.
>
> I understand that this is a problem and I have made significant changes to make sure my time will be released Friday evening every week going forward.
>
> I apologize for any difficulties I've caused. I am happy to discuss further if you wish.
>
> Thank you for your patience as I get this taken care of,
> Dan."

(Doc. No. 6-2 at PageID #35.)

Lonergan alleges that "[o]n December 6, 2023, [he] was told [he] was being placed on probation until [he] showed that [he] could properly bill hours." (Doc. No. 1 at PageID #3.) Defendant attaches numerous emails from December 6, 2023, in relation to this allegation. On the morning of December 6, 2023, Lonergan received an email from Defendant's Chief Administrative Officer inquiring: "Dan – Where is your time? It was due by 5:00 p.m. yesterday and we need to close the month. Please advise." (Doc. No. 6-3 at PageID #39.) Lonergan responded shortly afterwards: "Working on that first thing. Will let you know as soon as possible." (*Id.* at PageID #38.)

3

Later that morning, Lonergan sent a follow-up email as follows: "I have released all the time entries I have for November. I sincerely apologize for holding things up." (*Id.* at PageID #38.)

That same afternoon, Lonergan received an email from Defendant's Managing Partner Monica Sansalone ("Sansalone") that provided: "Dan, *** Attached is the spreadsheet I showed you. I recommend using it, and keeping it open on your computer so you can capture your time as you go."[3] (Doc. No. 6-4 at PageID #41.) The next day, on December 7, 2023, Lonergan received an email from Jerin inquiring: "How is the excel sheet working out?" (Doc. No. 6-5 at PageID #43.) Lonergan responded: "A step in the right direction. I dunno. I'm struggling, but I realize there's a limited amount anyone else can do. I could really use the weekend to reset and get myself together to start fresh." (*Id.*) In response, Jerin replied: "Sounds good. You have to find what works for you. If I can help in any way, please let me know. Remember – don't let perfect be the enemy of good." (*Id.*)

Lonergan alleges that "[w]ith the start of the new year, [he] was desperate to meet expectations," so he "put forward an unmaintainable effort, making sure to timely enter [his] hours each week, logging hours significantly above the standard required." (Doc. No. 1 at PageID #3.) "On January 24, 2024, [Lonergan] received [his] yearly evaluation … [and] was informed [he] would not be receiving any adjustment to [his] pay, based on [his] failure to accord with company practice, and that [his] probation would continue until [he] showed constant improvement." (*Id.*)

"On February 7, 2024, an email was sent to the entire firm, alerting the firm's attorneys that a number of hours had not been 'released' to the system." (*Id.*) Following this email, Lonergan

---

[3] This email was presumably sent following Lonergan being placed on probation and in relation thereto. (Doc. No. 1 at PageID #3; Doc. No. 6 at PageID #22.)

4

"promptly checked [his] account and discovered that there were four (4) hours that [he] had worked on a Saturday that [he] had failed to release." (*Id.*) According to Lonergan, "[t]his amounted to just more than 3% of the more-than one-hundred-eighty (180) hours [he] had logged for the month." (*Id.*)

Lonergan alleges that "[w]ithin the hour, [he] received a sharply critical email from [Sansalone]." (*Id.*) Sansalone's email provided as follows:

> "Dan,
>
> I understand that each month you are behind in entering and releasing time. This is entirely unacceptable. If one lawyers fails to timely enter time, it backs up our entire system which among other things is entirely unfair to our accounting department as directly impacts [sic] their ability to do their job. Accounting can't generate BIMS and thus invoices don't go out. This creates problems with clients who have strict guidelines in terms of deadlines for invoice submission and could result in the firm not being paid. This then impacts firm revenue and thus attorney compensation. You need to remedy this asap."

(Doc. No. 6-6 at PageID #46.) Lonergan responded to Sansalone as follows:

> "Monica,
>
> My hours were released timely every week this month. I had a single entry, 4 hours that I worked on a Saturday, that was not released as of this morning. I billed 182.9 hours in January, 178.9 of which had been released before[.]
>
> Please let me know if you misunderstood something about this situation, or if this is indeed what you would consider entirely unacceptable.
>
> Best,
> Dan."

(*Id.* at PageID #45–46.) Thereafter, Sansalone replied as follows:

> "Dan,
>
> Yes your time has improved, but we need to get time in by the deadlines imposed by accounting because as I said it backs up the entire system even if it is just one time entry. It is not a discretionary deadline. There are downstream consequences of one time entry which impacts the entire firm. I do see progress, but lawyers need to understand the impact on others and the firm in general."

(*Id.* at PageID #45.) Lonergan alleges that "[f]rom that point on, everything felt hopeless: my best effort was simply not good enough" and that "[t]he everyday difficulty caused by my disability compounded with despondence." (Doc. No. 1 at PageID #4.)

Lonergan alleges that "[b]y April, [he] had all but checked out," and that "[i]n [his] final email to the firm management, [he] expressed [his] despair that the firm had refused to work with [him] to address [his] issues." (*Id.*) Specifically, on the morning of April 9, 2024, Lonergan sent an email to numerous individuals (including Sansalone) indicating as follows:

"Good morning,

As you are likely aware, I was not able to release my March time.

I'm frustrated. I have tried to explain that this system does not work for me. It is not that I don't care or don't want to track my time. My brain does not work like that.

I have brought up a number of possible adaptations that would be more manageable for me. Each of these has been shot down. I do not feel there has been any attempt to meet me halfway.

I don't have an answer at this point. You have told me that this is unacceptable. At the same time, I'm miserable. I want things to work, but I can't work like this.

-Dan."

(Doc. No. 6-8 at PageID #50.) Approximately two hours later, one of Defendant's billing specialists (who was not a recipient of Lonergan's previous email) sent Lonergan an email inquiring: "The system is showing that you have unreleased time in March. Can you please release that time?" (Doc. No. 6-7 at PageID #48.) Lonergan responded: "That time is not complete or properly recorded and is not ready to be released. I'm not sure how to handle that at the moment." (*Id.*)

That day, on April 9, 2024, "Monica Sansalone and Tim Brick arrived at [Lonergan's] office," "informed [him] that [he] was terminated, watched [him] pack [his] things, and escorted [him] directly to the elevators." (Doc. No. 1 at PageID #4.)

6

## II.      Procedural History

On November 26, 2024, Lonergan filed his Complaint against Defendant. (Doc. No. 1.) Therein, Lonergan alleges two claims: (i) Violation of 42 U.S.C. §§ 12101 *et seq.*, the Americans with Disabilities Act ("ADA"); and (ii) Violation of Ohio Rev. Code § 4112.02. (*Id.*) On January 31, 2025, Defendant filed a Verified Answer to Lonergan's Complaint. (Doc. No. 6.) That same day, Defendant filed its Motion for Judgment on the Pleadings. (Doc. No. 7.) On February 3, 2025, Lonergan filed his Opposition to Defendant's Motion ("Opposition"). (Doc. No. 8.) On February 18, 2025, Defendant filed its Reply in Support of its Motion ("Reply"). (Doc. No. 9.) Accordingly, Defendant's Motion is ripe for review.

## III.     Standard of Review

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (quoting *S. Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 479 F.2d 478, 480 (6th Cir. 1973)).

The same standard for deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim applies to a Rule 12(c) motion for judgment on the pleadings. *See Roth v. Guzman*, 650 F.3d 603, 605 (6th Cir. 2011). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative

level.'" *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).

The measure of a Rule 12(b)(6) challenge—whether the complaint raises a right to relief above the speculative level— "does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'" *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Twombly*, 550 U.S. at 555-56). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Deciding whether a complaint states a claim for relief that is plausible is a "context specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.

Consequently, the examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief. Specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)) (internal quotation marks omitted). Nonetheless, while "Rule 8 marks a notable and generous departure from the hyper technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 679.

IV. Analysis

    A.     Discrimination Claims[4]

In its Motion, Defendant contends that Lonergan is not a "qualified individual with a disability" because he cannot perform the essential functions of his position with or without reasonable accommodation. (Doc. No. 7-1 at PageID #57.) Specifically, Defendant asserts that a suggested accommodation is not reasonable if it requires eliminating an "essential" function of the job, and that employers are not required to shift an essential job function onto others. (*Id.* at PageID #58.) Thus, Defendant argues that recording and releasing billable time in compliance with client fee agreements is an essential function of the associate attorney position, and that Lonergan explicitly advised that Gallagher Sharp's billing guidelines do not work for him.[5] (*Id.*) Defendant also contends that tracking time is a function that only Lonergan could perform, as no one else (including his legal assistant) could reasonably monitor or document the time Lonergan devoted to performing client services. (*Id.*) Finally, Defendant maintains that any accommodation Lonergan could have proposed would have required Defendant to either modify its fee agreements with clients, bill outside the guidelines of existing fee agreements, or charge clients an inaccurate fee—all of which Defendant

---

[4] "Both federal and Ohio discrimination actions require the same analysis." *Hazen v. Cleveland Clinic Foundation*, 2022 WL 3083027, at *4 (N.D. Ohio July 29, 2022) (Barker, J.). Accordingly, the Court will evaluate Lonergan's claims under the ADA and Ohio law together.

[5] In its Motion, Defendant cites to Lonergan's Complaint and the April 9, 2024, emails to assert that Lonergan indicated on his final day of employment that "Gallagher Sharp's billing guidelines do not work for me." (Doc. No. 7-1 at PageID #58.) The Court briefly notes that this quote does not appear in either source. Rather, in his April 9, 2024, email, Lonergan provides: "I have tried to explain that *this system* does not work for me." (Doc. No. 6-8 at PageID #50) (emphasis added). The Court thus relies on this exact quote in its analysis, as opposed to Defendant's assertion that Lonergan "explicitly advised Gallagher Sharp on his final day of employment that 'Gallagher Sharp's billing guidelines do not work for me.'" (Doc. No. 7-1 at PageID #58.)

submits is *per se* unreasonable and/or illegal under the Ohio Rules of Professional Conduct. (*Id.* at PageID #59.)

In his Opposition, Lonergan primarily argues that Defendant's arguments are premature at this stage. (Doc. No. 8 at PageID #62.) Lonergan alludes to numerous arguments, including that: (i) the emails provided show that he had been communicating his difficulties from early on in his employment; (ii) flat fee billing is not prohibited by the Ohio Rules of Professional Conduct; (iii) rejecting ideas and proposing nothing in return is not participating in a good-faith interactive process required by the ADA; and (iv) "Gallagher Sharp's position here reads as though the firm is suggesting that the very reason the occupation of 'lawyer' exists is to bill hours," which "[t]o [Lonergan], that definition is so reductive it is insulting to the entire profession." (Doc. No. 8 at PageID #61–62.) However, Lonergan does not develop any of these arguments further because he contends that a "Motion for Judgment on the Pleadings is not the appropriate setting to litigate the entire matter." (*Id.* at PageID #62.)

Instead, Lonergan points to his allegations that he "repeatedly approached partners at the firm and suggested accommodations that [he] believed would allow [him] to accomplish [his] position's necessary tasks … [and] [i]n each instance, [he] was told that [his] suggestions simply would not work, and that [he] needed to figure it out on [his] own." (Doc. No. 8 at PageID #63.) Lonergan also points to his allegations that Gallagher Sharp "violated the ADA by taking adverse employment actions against a disabled employee while failing to provide any reasonable accommodations" and "by failing to engage in a good-faith discussion to determine possible accommodations." (*Id.*) Finally, Lonergan contends that the "Sixth Circuit recognizes claims where the plaintiff alleges the ability to perform the job with an alleged essential job requirement eliminated," and that Defendant

will bear the burden at trial of showing the challenged job criteria is essential or that a proposed accommodation will impose an undue hardship upon the employer. (*Id.* at PageID #64.)

In its Reply, Defendant submits that Lonergan's opinion about billing by the hour being "beneath the true essence of lawyering … does not alter the fundamental fact that Gallagher Sharp is a private civil litigation defense firm whose entire ability to operate depends on billing its clients, in most cases by the hour, for its work." (Doc. No. 9 at PageID #66.) Next, Defendant contends that Lonergan misconstrues Sixth Circuit precedent, and that "courts in the Sixth Circuit have repeatedly held that employers need not eliminate an essential job function to accommodate an employee's alleged disability." (*Id.* at PageID #67–69.) Defendant thus asserts that Lonergan, in his emails, conceded that Defendant's "billing practices did not 'work' for him because his 'brain does not work that way' … [and] that there was 'very little anyone else could do' to ensure he properly entered and released his time." (*Id.* at PageID #69–70.) Accordingly, Defendant argues these tasks are essential to an associate attorney's role in private practice, and that Lonergan's request to be exempt from them is *per se* unreasonable. (*Id.* at PageID #71.)

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). An employer discriminates under the ADA when it does "not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A).

> To assert a failure to accommodate claim, Plaintiffs must plausibly allege that they are (1) disabled, yet (2) otherwise qualified for the position despite their disability: (a) without accommodation from the employer; (b) with an alleged essential job requirement eliminated; or (c) with a proposed reasonable accommodation; (3) that

11

their employer was aware of their disability; (4) that they requested an accommodation; and (5) that their employer failed to provide the requested reasonable accommodation.

*Schobert v. CSX Transp. Inc.*, 504 F. Supp. 3d 753, 791-92 (N.D. Ohio 2020) (citing *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 811 (6th Cir. 2020)).

"A 'qualified individual' is an employee with a disability who can perform the 'essential functions' of his job 'with or without reasonable accommodation.'" *Cooper v. Dolgencorp, LLC*, 93 F.4th 360, 368 (6th Cir. 2024) (citing § 12111(8)). "The term essential functions means the fundamental job duties of the employment position … [and] does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). In other words, "[a] job function is essential if its removal would fundamentally alter the position." *Davis v. Larry's IGA*, 2010 WL 746433, at *2 (E.D. Mich. Mar. 2, 2010) (citing *Kiphart v. Saturn Corp.*, 251 F.3d 573, 584 (6th Cir. 2001)).

"Failure-to-accommodate cases typically fall into two broad categories: (1) cases where the plaintiff does not want an accommodation but instead makes 'the straightforward claim' that he can do his job 'as it exists'; and (2) 'those in which the plaintiff challenges a particular job requirement as unessential or claims that he can do the job with reasonable accommodations on the part of the employer." *Id.* at 369 (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1182 (6th Cir. 1996)).

Under the second category, "[i]f the employer claims [] that the disabled individual would be unqualified to perform the essential functions of the job even with the proposed accommodation, the disabled individual must prove that he or she would in fact be qualified for the job if the employer were to adopt the proposed accommodation." *Preston v. Great Lakes Specialty Finance Inc.*, 724 Fed. App'x. 453, 455 (6th Cir. 2018); *see also Cooper*, 93 F.4th at 371. "[A]n ADA plaintiff bears the initial burden of proposing an accommodation and showing that accommodation is objectively

reasonable." *Bernau v. Architectural Stainless, Inc.*, 2017 WL 2831518, at *4 (E.D. Mich. June 30, 2017) (citing *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007)); *see also Adams v. The Vanderbilt Univ.*, 2024 WL 1182861, at *19 (M.D. Tenn. Mar. 19, 2024) (applying this initial burden at pleading stage); *Easter v. Transport Service, Co.*, 2007 WL 4260809, at *4 (E.D. Tenn. Nov. 30, 2007) (same).

The Court finds that Lonergan's Complaint fails in numerous respects. First, Lonergan's Complaint is devoid of any factual allegations detailing the "reasonable accommodations" he claims to have requested. The only relevant allegation on this point is that Lonergan "repeatedly approached partners at the firm and suggested accommodations that I believed would allow me to accomplish my position's necessary tasks." (Doc. No. 1 at PageID #3.) Yet this allegation is wholly conclusory. Lonergan includes no details indicating what he even suggested, let alone how that related to his position. Indeed, Lonergan concedes as much in his Opposition, noting that the "obviously unreasonable" proposals referenced by Defendant "are noticeably absent from the Complaint and the provided emails."[6] (Doc. No. 8 at PageID #61–62.) And even then, Lonergan does not clarify or elaborate as to what his actual proposed accommodations were (to the extent that he even challenges that Defendant's referenced proposals are incorrect). Moreover, with no information regarding what

---

[6] Despite expressly conceding that the "'objectively unreasonable' proposals" referenced by Defendant are absent from the provided emails, Lonergan—in the same paragraph—contradictorily alludes that "the emails Gallagher Sharp has provided show … [t]hat I offered multiple 'proposed accommodations.'" (Doc. No. 8 at PageID #61.) Notwithstanding Lonergan's own concession that the alleged accommodations "are noticeably absent from … the provided emails," the Court's independent review reveals that the emails do not contain any details regarding accommodations that Lonergan may have requested. (*See* Doc. Nos. 6-1, 6-2, 6-3, 6-4, 6-5, 6-6, 6-7, 6-8.) Rather, the emails instead show the various instances in which Lonergan failed to record his hours on time. (*See id.*) The only reference to accommodations exists in Lonergan's email dated April 9, 2024, in which he provides: "I have brought up a number of possible adaptations that would be more manageable for me." (Doc. No. 6-8 at PageID #50.) Again, however, this does not include any details as to what Lonergan requested. In short, Lonergan's Complaint wholly fails to provide this Court with any details to permit it to conclude that he has alleged that he requested an objectively reasonable accommodation.

13

his proposed accommodation would be, the Court cannot conclude that Lonergan has pled that he would "in fact be qualified for the job if the employer were to adopt the proposed accommodation." *Preston*, 724 Fed. App'x. at 455; *see also Cooper*, 93 F.4th at 371. The Court thus finds that Lonergan's sole conclusory allegation in his Complaint falls short of Rule 8 standards.[7]

In similar fashion, the Court rejects Lonergan's arguments regarding the failure to engage in a good-faith discussion. First, Lonergan again references conclusory allegations on this point.[8] Notwithstanding this fatal deficiency, however, the Sixth Circuit has held that "[a]lthough mandatory, failure to engage in the interactive process is only an independent violation of the ADA if the plaintiff establishes a prima facie showing that he proposed a reasonable accommodation." *Rorrer v. City of*

---

[7] Notwithstanding the Court's conclusion that Lonergan fails to sufficiently plead that he requested a reasonable accommodation, the Court finds that even if he had pled the accommodations referenced by Defendant, it would find that such accommodations were not reasonable. Defendant's Answer references various proposed accommodations involving estimating and working on a fixed-fee rate, and that such accommodations would be unreasonable because they would run afoul of the client fee agreements entered into. In response, Lonergan indicates that "[t]he idea that flat-fee billing is expressly prohibited by the ethical rules themselves will come as an unpleasant surprise to many." (Doc. No. 8 at PageID #62.) Yet Lonergan misses the mark. It is not that flat fee billing itself is expressly prohibited by the ethical rules. Rather, it is that billing for work outside the agreed-upon scope of representation without prior client approval is prohibited by the ethical rules, as "[a]ny change in the basis or rate of the fee or expenses … shall promptly be communicated to the client." *See* Ohio Prof. Cond. Rule 1.5(b). And to the extent that Lonergan suggests that it would be reasonable to require Defendant to alter its currently existing fee agreements with every client that Lonergan would be involved with so that Lonergan could work on a flat fee basis or "estimate" his fees, the Court rejects that argument. *See Tchankpa v. Ascena Retail Group, Inc.*, 951 F.3d 805, 809 (6th Cir. 2020) ("The ADA is not a weapon that employees can wield to pressure employers into … reconfiguring their business operations. Instead, it protects disabled employees from disability-related mistreatment—no more, no less."). Finally, the Court rejects the notion that eliminating the billing requirement all together would be a reasonable accommodation. Indeed, Lonergan's Complaint appears to reference billing as one of his "position's necessary tasks." (Doc. No. 1 at PageID #3.) Lonergan offers no meaningful argument in response to Defendant's assertion that billing hours is a "fundamental function of his role as an associate attorney." (Doc. No. 7-1 at PageID #59.) As indicated in Defendant's Reply, Defendant's "entire ability to operate depends on billing its clients, in most cases by the hour, for its work." (Doc. No. 9 at PageID #66.) Lonergan offers no explanation, nor can the Court find any, to even suggest that removing the billing requirement would not fundamentally alter his position. *See Davis*, 2010 WL 746433, at *2 ("A job function is essential if its removal would fundamentally alter the position."); *Cooper*, 93 F.4th at 372 ("Nor does a reasonable accommodation require employers to eliminate or reallocate an essential job function.").

[8] (*See* Doc. No. 1 at PageID #4 ("Defendant violated the ADA by failing to engage in a good-faith discussion to determine possible accommodations.").)

14

*Stow*, 743 F.3d 1025, 1041 (6th Cir. 2014). Because Lonergan fails to even allege as much here, his argument fails for the same reasons stated above.

Therefore, the Court finds that Lonergan has failed to plead facts to plausibly support that he was a "qualified individual" who could perform the essential functions of his job with or without reasonable accommodation—including a lack of any allegations detailing what accommodations were even requested, let alone whether they were reasonable. *Cooper*, 93 F.4th at 368. Accordingly, the Court concludes that Lonergan has failed to state a claim under both the ADA and Ohio law and hereby dismisses his claims.

### B.   Lonergan's Request for Leave to Amend

Finally, in one sentence at the end of his Opposition, Lonergan requests "if the Court should deem it proper, … leave to amend [his] Complaint to add the specific allegation that [he] would be capable of performing the job 'without accommodation from the employer, with an alleged 'essential' job requirement eliminated; or with a proposed reasonable accommodation." (Doc. No. 8 at PageID #65.)

The Sixth Circuit has held that "a bare request in an opposition to a motion to dismiss— without any indication of the particular grounds on which amendment is sought … does not constitute a motion within the contemplation of Rule 15(a)." *Louisiana School Employees' Retirement System v. Ernst & Young, LLP*, 622 F.3d 471, 486 (6th Cir. 2010); *see also Alexander v. Eagle Manufacturing Company, LLC*, 714 Fed. App'x. 504, 511 (6th Cir. 2017).

The Court rejects Lonergan's request to amend for two reasons. First, Lonergan has not properly made a motion for leave to amend accompanied by a proposed amended complaint that indicates "the particular grounds on which amendment is sought." *See id.* Moreover, Lonergan does

15

not even indicate the specific allegations that he would seek to include. Instead, he merely reiterates the conclusory standard under the ADA. Second, even if Lonergan had included specific factual allegations or a proposed amended complaint, the Court would decline to permit amendments at this stage. Defendant filed its Motion on January 31, 2025. It has since been over five months, and at any point Lonergan could have filed a motion to amend and proposed amended complaint but did not. *See, e.g.*, *Detrick v. KCS International Inc*, 2025 WL 1697482, at *5 (N.D. Ohio June 17, 2025) (Barker, J.) (declining request to amend where plaintiff waited over six months to formally request leave to amend and instead "made the strategic decision to wait for the Court to rule on Defendants' Motion to dismiss"). Accordingly, the Court declines to permit Lonergan to amend his Complaint at this juncture.[9]

V.  Conclusion

Accordingly, for the foregoing reasons, Defendant's Motion is GRANTED.

**IT IS SO ORDERED.**

Dated: July 10, 2025  　　　　　　　　　　　　　　　  s/ Pamela A. Barker
　　　　　　　　　　　　　　　　　　　　　　　　　　PAMELA A. BARKER
　　　　　　　　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE

---

[9] In any event, the Court notes that any amendments would likely be futile for the same reasons previously discussed in this Opinion. *See, e.g.*, *supra* note 7. Regardless, the Court independently rejects Lonergan's request to amend for the reasons stated above.

16